## IN THE UNITED STATES DISTRICT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ATHENS DIVISION

| | | |
|---|---|---|
| **TULSIE BHOODAI,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:19-CV-111 (CAR)** |
| **v.** | : | |
| | : | |
| **EMPLOYERS ASSURANCE** | : | |
| **COMPANY,** | : | |
| | : | |
| **Intervenor Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **GARANT-MASCHINEHANDEL** | : | |
| **GMBH,** | : | |
| | : | |
| **Defendant.** | : | |

_____

## <u>ORDER ON PRE-TRIAL MOTIONS</u>

Plaintiff Tulsie Bhoodai alleges negligence and strict product liability claims against Defendant Garant-Machinehandle GMBH, a German company, for defectively designing and manufacturing a bag manufacturing machine with two rollers that were not adequately guarded. Plaintiff alleges the defect caused his hand to become trapped in the machine's rollers and caused serious injuries. Currently before the Court are motions to exclude expert opinions from both Plaintiff and Defendant, several motions

1

in limine to exclude evidence, and Defendant's motion for summary judgment. For the reasons explained below, Defendant's Motion to Exclude Opinion and Testimony from Plaintiff's Expert Jeffrey Warren [Doc. 51] is **DENIED**; Plaintiff's Motion to Exclude Opinion and Testimony from Defendant's Expert Richard Parry [Doc. 49] is **GRANTED in part and DENIED in part**; Plaintiff's Motion in Limine to Exclude Evidence that Plaintiff Operated the Machine with the Guard Raised [Doc. 50] is **DENIED**; Defendant's Motion in Limine Regarding Subsequent Remedial Measures [Doc. 52] is **HELD IN ABEYANCE** until the pretrial conference; Plaintiff's Motion for Sanctions [Doc. 55] is **DENIED**; and Defendant's Motion for Summary Judgment [Doc. 51] is **DENIED**.

## BACKGROUND

At all times relevant to this action, Plaintiff worked as a machine operator at Flexo Converters Georgia, Inc. in Monroe, Georgia. On April 3, 2018, Plaintiff was stationed at a Triumph 5QT, 7582G, S.O.S. Block Bottom Bag Machine ("the Machine") manufactured by Defendant. The Machine utilizes a series of rollers and other mechanisms to produce consumer bags and packaging from reels of paper. Plaintiff alleges on April 3, 2018, a reel of paper broke in the Machine; thus, he was required to re-feed the paper through the rollers in the Machine so the bags could be assembled. As Plaintiff fed the paper in the Machine, his hand was pulled forward through the opening between the bottom of the

protective guard and the table, got caught in the nip created by the two draw rolls, and he suffered severe degloving injuries to three fingers on his left hand.

Plaintiff contends Defendant negligently and defectively designed, manufactured, and sold the Machine and failed to warn Plaintiff of the defective design. Specifically, Plaintiff contends the opening beneath the protective guard was too large and too close to the hazardous nip point between the two draw rollers, thus allowing Plaintiff's hand to become caught in the nip and causing his injury. Defendant counters that the Machine complied with all applicable safety standards; Plaintiff was inappropriately operating the Machine with the protective guard in the raised position; and he failed to use the safeguards and training Defendant specifically designed to keep the operator's hands away from the moving bag material and any hazardous machine components.

The following facts are set forth in the light most favorable to Plaintiff, as the nonmoving party for summary judgment.

Defendant manufactured the Machine in Germany in 2016 and installed it at Flexo Converter's plant in Monroe, Georgia. The Machine manufactures paper bags and is electrically controlled, such that once it is running, production of the bags is completely automated.[1] Paper unwinds from a large roll and is pulled through the printer and

---

1  Parry Expert Report, p. 4 [Doc. 49-5].

handle attachment stations; the paper then passes through the formation mechanisms, and finished bags are discharged onto the packing table.[2]  The Machine operator monitors the line, installs new paper stock, makes adjustments, and adds glue and ink as required.[3] The Machine produces 100 bags per minute.[4]

To protect the operator from the many moving, revolving machine components, the Machine is equipped with a protective clear plexiglass guard above the table. The paper enters the Machine through the opening between the bottom of the protective guard and the table beneath it. Plaintiff's expert, Dr. Jeffrey Warren, measured that opening to be 2.06 inches (52.4 mm) high. The Machine then feeds the paper onto two draw rollers located behind the clear plexiglass guard. Plaintiff's expert measured the inrunning nip point between the two draw rollers that injured Plaintiff to be 7.25 inches (184.2 mm) behind the guard.[5]

Defendant manufactures the Machine so that it will only run if the protective guard is in the lowered (or closed) position. The Machine is equipped with an automatic shut-off mechanism: If the protective guard is raised or it gets lifted while the Machine is

---

2  *Id.*
3  *Id.*
4  *Id.*
5  Warren Expert Report, pp. 7-8 [Doc. 49-3, pp. 11-12].

running, the Machine will automatically shut down.[6]  The protective guard need only be lifted half an inch or less for the Machine to shut off.[7] But the automatic shut-down mechanism can be bypassed.[8]

The Machine is also equipped with a "two-hand jog" mechanism in which operators may use two buttons on the Machine to feed paper under the draw roller.[9]  The two-hand jog allows paper to be fed under the draw roller while the operator's hands are safely outside of the Machine.[10]

Plaintiff began working at Flexo Converters in June 2017 as an operator on the Machine. On April 3, 2018, approximately four to five hours into his shift, Plaintiff was stationed at the Machine when the paper going into the Machine broke.[11] "Paper breaks" on the Machine were common, and Plaintiff had successfully managed eight to ten previous paper breaks during his shift.[12] The parties dispute what happened next, and the Court, as it must, tells the events in the light most favorable to Plaintiff.

---

6  Pl. Depo., p. 81 [Doc. 49-1].
7  Edmondson Depo., pp. 10-11 [Doc. 50-3].
8  *Id.* at p. 13.
9  Pl. Depo., pp. 92-93.
10  *Id.*
11  *Id.* at p. 51.
12  *Id.*

After the paper broke, Plaintiff employed the same process to refeed the paper that he used every time after a paper break: He hit the emergency stop button on the Machine; after the Machine stopped, he raised the protective guard and cleared the paper; he then used the two-hand jog mechanism to jog the paper and align it under the front draw roller; he lowered the protective guard, went to the front of the Machine so that he was protected by the guard, and restarted the Machine at the slowest speed.[13]

The rollers are located behind the protective guard when it is in the lowered (or closed) position. The front roller guides the paper to the second roller.[14]  Through the clear protective guard, Plaintiff saw that the front roller picked up the paper, and it was moving. But he noticed that the paper was shifting and misaligning.[15]  So Plaintiff put his hands on the paper and began adjusting it in the direction he wanted it to go.[16]  As Plaintiff was guiding the paper behind the protective guard, one of the draw rollers caught the paper, and his left hand was pulled under the 2.06 inch opening beneath the protective guard, got caught in the inrunning nip points of the draw rollers, and he was severely injured.[17]

---

13  *Id.* at pp. 52-57; 100-102
14  *Id.* at p. 68.
15  *Id.* at pp. 61, 101-102
16  *Id.* at pp. 67; 102
17  *Id.* at pp. 69, 99, 102.

Plaintiff unequivocally states he was operating the Machine with the guard in the lowered (or closed) position when he was injured. Indeed, Plaintiff testified that operators cannot operate the Machine with the guard raised because the Machine would not start.[18] Plaintiff also testified that he has never operated the Machine with the guard raised and never seen anyone operate the Machine with the guard raised while he worked at Flexo Converters.[19]

Plaintiff did not use the two-hand jog mechanism because he was aligning the paper in front of the protective guard. He states it was unnecessary to use the two-hand jog because the paper was already threaded into the draw rollers behind the protective guard, and the guard was supposed to protect his hands.[20] Plaintiff explained that the two-hand jog is used to feed the paper from roller to roller behind the protective guard; at the time of his injury, he was in front of the guard re-aligning the paper, and therefore he did not need to use the two-hand jog.[21]

Dennis Edmondson, a maintenance technician employed by Flexo Converters, was working at another machine at the time of Plaintiff's injury.[22] Edmondson testified that

---

18  *Id.* at p. 90.
19  *Id.* at pp. 81-82;
20  *Id.* at pp. 94, 96.
21  *Id.* at pp. 97-98.
22  Edmondson Depo., p. 12 [Doc. 50-3].

operators at Flexo Converters would bypass the Machine's automatic shut-down mechanism, so they could feed paper into the draw rollers with the guard in the raised position. In fact, he testified that it was Flexo's policy to bypass the automatic shut-down mechanism on the machines and was "the norm."[23]  Edmondson also stated that he had seen Plaintiff operate the Machine with the guard in the raised position on a few other occasions.[24]  But Edmondson did not see Plaintiff operating the Machine at the time of his injury and does not know if the guard on the Machine was raised or lowered when Plaintiff was injured.[25]

After Plaintiff's injury, Flexo's plant manager added plexiglass to the bottom of the guard to extend the guard and narrow the opening under the guard.[26]  None of Defendant's employees know of any prior injuries with the Machine, and Defendant's records show no reports, injuries, or incidents involving operator safety arising out of the use of any of Defendant's 5QT machines like the one involved in Plaintiff's injury.[27]

Plaintiff and Defendant each retained mechanical engineer experts to assess the design and safety of the Machine. Plaintiff's expert, Jeffrey Warren, Ph.D., opines that the

---

23  *Id.* at pp. 15-16; 18.
24  *Id.* at p. 13.
25  *Id.* at p. 27.
26  *Id.* at 33.
27  Burkhardt Affidavit [Doc. 51-6].

Machine's protective guard was ineffective because the 2.06 inch (52.4 mm) opening between the bottom of the guard and the table failed to comply with applicable safety regulations and allows an operator's hand to enter the opening and into the hazardous inrunning nip points created between the draw rolls[28]; the guard was too close to the hazardous inrunning nip points given the height of the opening[29]; reducing the height to 20mm would have complied with the requirements of ISO 13857.2008(E) section 4.2.4.1, and Table 4 and would have prevented Plaintiff's injury[30]; the Machine design and construction violated OSHA 1910.212(a)(1) and applicable safety standards including DIN EN 1010-1:2011-06 section 5.2.1.1; ISO 13857-2008(E) section 4.2.4.1, and Table 4; ISO 12100:2010(E) sections 4, 5.6.2 and 6.3.3.1; Directive 2006/42/EC Annex I; 29 CFR 1910.212 section (a)(3)(ii); ASME B15.1-2000 section 3.2.1 and Figure E12; and 29 CFR 1910.217 table O-10; the risk of the Machine outweighs its utility; and the defective Machine is a cause of Plaintiff's injury.

Defendant's expert, Mr. Richard Parry, opines that the Machine was safe and fit for its intended use, and the cause of the accident and injuries was Plaintiff's or Flexo's failure to utilize the safeguards and training specifically designed to keep an operator's

---

28  Warren Expert Report, p. 27 [Doc. 49-3, p. 31].
29  *Id.* at p. 33.
30  *Id.* at p. 46.

9

hands away from the moving bag material and any hazardous machine components. Specifically, Mr. Parry states that had Plaintiff used the two-hand jog safeguards, the accident would not have occurred; foreign safety standards are not applicable to, nor determinative of, what is deemed safe in the United States; the guard met with applicable safety standards including 29 CFR 1910.219, 29 CFR 191.212, and ANSI/ASME B15.1; and Plaintiff was operating the Machine with the guard in the raised position at the time of the accident.[31]

## I.   MOTIONS TO EXCLUDE EXPERT TESTIMONY

Plaintiff and Defendant have each filed motions to exclude certain opinions from the other's mechanical engineering expert.

### Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. [32]

---

[31]  Parry Expert Report, pp. 5-9 [Doc. 49-5, p. 7-11].
[32]  Fed. R. Evid. 702.

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[33]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[34] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[35]   Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[36]  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[37]

---

[33] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (citing *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke Cnty.*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).
[34]  509 U.S. 579 (1993).
[35]  *Id.* at 589, n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).
[36]  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).
[37]  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[38] The trial court must also "'conduct an exacting analysis' of the underlined foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702."[39] Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of fact.[40]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[41] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[42] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific

---

[38] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.

[39] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257) (emphasis in original).

[40] *See Daubert*, 509 U.S. at 591.

[41] *Id.* at 592-93 & n. 10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[42] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311-12 (11th Cir. 1999).

expert witnesses.[43]  Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[44]  Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[45]

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[46]  Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[47]  Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[48]  In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[49]

---

[43] *See Kumho Tire*, 526 U.S. at 147.

[44] *McClain*, 401 F.3d at 1238 & n. 2; *see also Frazier*, 387 F.3d at 1260.

[45] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

[46] *Frazier*, 387 F.3d at 1260.

[47] *Id.* at 1260-61.

[48] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

[49] *Poulis-Minott*, 388 F.3d at 359.

Regarding the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts in issue."[50] This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate."[51]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance.[52] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[53]  Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[54]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

---

[50] *Frazier,* 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592-93) (internal alterations omitted).

[51]  *Daubert,* 509 U.S. at 595; *see also Goebel,* 346 F.3d at 992.

[52] 509 U.S. at 593-95; *see also J & V Dev., Inc.,* 387 F. Supp. 2d at 1224.

[53] *See Kumho Tire,* 526 U.S. at 150-52.

[54]  *Id.* at 151-52.

(1)   Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)   Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)   Whether the expert has adequately accounted for obvious alternative explanations;

(4)   Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)   Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[55]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[56]

Finally, for admission, the expert testimony must assist the trier of fact.   Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[57]   "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[58]   Nor does expert testimony help the trier of fact if it fails to "fit" with the

---

[55] Fed. R. Evid. 702 advisory committee's note (2000 amendments).

[56] *See id.*

[57] *Frazier*, 387 F.3d at 1262.

[58] *Id.* at 1262-63.

facts of the case.[59]   Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[60]   "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[61]   Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."[62]   At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder.   A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."[63]   "Vigorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[64]   A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies";[65] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[66]

---

[59] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[60] *Id.*; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[61] *General Electric*, 522 U.S. at 146.

[62] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[63] *Allison*, 184 F.3d at 1311.

[64] *Daubert*, 509 U.S. at 596.

[65] *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

[66] *Frazier*, 387 F.3d at 1272.

A. **DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERT JEFFREY WARREN, PH.D.**

Plaintiff engaged Jeffrey Warren, Ph.D. as an expert on matters of mechanical engineering and machine design and safety. Defendant seeks to exclude Dr. Warren's testimony and his original and supplemental expert reports on grounds that they fail to satisfy the Rule 702 requirements for admissibility.

1. **Dr. Warren's Qualifications**

Dr. Warren received his Bachelor of Science in Mechanical Engineering from the University of North Carolina in 1973, his Master of Science in Mechanical Engineering from Virginia Polytechnic Institute and State University in 1975, and his Doctor of Philosophy in Mechanical Engineering from Virginia Polytechnic Institute and State University in 1977. [67] He is a licensed professional engineer in 17 states, including Georgia, and is a Certified Safety Professional in Engineering Aspects. [68] Dr. Warren is a member of the American Society of Safety Professionals, National Society of Professional Engineers, and National Academy of Forensic Engineers and former member of the

---

67  Warren's Expert Report [Doc. 49-3, p. 56].
68  *Id.* at p. 60.

National Safety Council, Institute for Safety through Design, and ANSI B11.TR3 Sub-Committee on Hazard Identification and Risk Assessment.[69]

Since 1997, Dr. Warren has been the CEO and Chief Engineer of the Warren Group, Inc., where he "perform[s] specialized consulting and training related to unintentional injuries involving mechanical engineering, machine design and safety, product liability, and property loss analysis."[70] His work specifically involves hazard identification, risk assessment, machine safeguarding, failure analysis, and standards and codes compliance.[71]

Before establishing his own firm, Dr. Warren taught at the University of South Carolina as an Assistant Professor of Engineering, designed machines for manufacturers including Lockheed-Georgia Company, Union Carbide Corporation, and E.I. Du Pont de Nemours & Co., Inc., and was a partner at Summit Engineering, L.L.P where he "perform[ed] specialized consulting in the areas of: Hazards Identification and Analysis; Analysis and Evaluation of Designs, Component Testing, Operating Instructions, Guards and Warnings, Standards and Codes compliance; Accident Evaluation (Machinery,

---

69  *Id.*
70  *Id.* at p. 56.
71  *Id.*

Equipment, and Consumer Products); [and] Machine Design, Controls, Guards, Warnings, Human Factors, OSHA Standards [and] Code Compliance."[72]

Dr. Warren has written and presented on machine design and guarding. His articles and presentations include: "Dangerous Nip Points Can Be Guarded," "Machine Injuries: Investigating the Cause," "Investigation of Injury Cases Caused by Defective Machinery, Equipment and Products," "Product Design Issues as a Cause of Injury: As a Design Engineer, You Can Make a Difference," "Using Safety through Design to Investigate unintentional Machine Guarding Injuries," "Machine Guarding," "Industrial Machine Safety: The Fundamentals of Hazard Identification, risk Assessment and Safety through Design," "Investigating Unintentional Machine Guarding Injuries: Questions to Ask and Pictures to Take," and "Machine Safeguarding and Safety through Design."[73]

## 2. **Dr. Warren's Inspection of the Machine**

Four months after the accident, on August 18, 2018, Dr. Warren traveled to Flexo Converters in Monroe, Georgia and inspected, photographed, measured, and performed tests on the Machine that Plaintiff operated when the injury occurred.[74] He measured the guard opening to be 2.06 inches (52.4 mm) and measured the distance from the guard to

---

[72] *Id. at pp. 56-59.*

[73] *Id.* at pp. 72, 74, 75-76, 78-80.

[74] *Id.* at pp. 6, 11.

the edge of the shaft for the draw rolls where Plaintiff was injured to be 7.25 inches (184.2 mm ).[75]

Dr. Warren tested the Machine and the guard with a GUARDCHEK device, which "is patterned after the dimensions found in Table O-10 of 29 CFR 1910.217, a safety code commonly used to determine maximum allowable guard openings based on the distance to a hazard."[76] The GUARDCHEK device utilizes "a series of attached cylinders . . . to simulate the dimensions of a person's fingers, hand and arm" and "[i]f the GUARDCHEK device can reach a hazard through an opening in or under a guard, then a person's fingers or hand can reach the same hazard and the guard is too close to the hazard and must be made more restrictive."[77]

### 3.  **Dr. Warren's Opinions**

Dr. Warren offers opinions that the design of the Machine was defective and unreasonably dangerous, violated industry safety standards and regulations, and was a cause of Plaintiff's injuries.[78] In addition to inspecting the Machine, Dr. Warren reviewed the following: the parties' discovery responses; depositions of Plaintiff, Defendant's

---

75  *Id.* at pp. 11-13.
76  *Id* at pp. 12-15; Warren Supplemental Expert Report [Doc. 49-4, p. 18].
77  Warren Supplemental Expert Report [Doc. 49-4, pp. 11-12, 17-19, 50].
78  *Id.* at pp. 50-53.

employees, and Ulrich Winkler, Defendant's engineer who conducted the risk assessment

of the Machine; the Machine's Operating Manual; the risk assessment; Richard Parry's

expert report; and industry standards and regulations, including ISO 13857, ISO 12100,

and Directive 2006/42/EC.[79]

Dr. Warren concludes that the Machine's guard violated industry safety standards

and regulations because the opening below the guard was too large given the distance

from the guard to the hazard, the risk of harm posed by the hazard had not been

adequately reduced, and, as such, the Machine was improperly guarded, defective, and

a cause of Plaintiff's injuries.[80] Defendant seeks to exclude any mention of the

International Safety Standards (ISO standards) and challenges six of Dr. Warren's

opinions.

**ISO Standards**

The Court rejects Defendant's contention that the ISO standards, promulgated by

the International Organization for Standardization ("ISO"), are irrelevant in this case. ISO

is an international organization that publishes international industry standards; the

---

[79] Warren Expert Report [Doc. 49-3, pp. 22-33, 89-98]; Warren Supplemental Expert Report [Doc. 49-4, pp. 5 and 129]; and Defendant's Response to Plaintiff's First Set of Interrogatories and Request for Production of Documents [Doc. 49-10].

[80] Warren Expert Report [Doc. 49-3, pp. 22-26, 30-33]; Warren Supplemental Expert Report [Doc. 49-4, pp. 11-17].

American National Standards Institute ("ANSI") is a founding and active member of ISO and the representative body for the United States in ISO; and ANSI is a member of the technical committee that developed ISO 12100 and ISO 13578.[81]

ISO 13587 is a world-wide industry standard that Defendant, through the EC Declaration of Conformity and its discovery responses, has represented and certified is applicable to the Machine, and Defendant's head of design, Joerg Thies, has represented and certified that the Machine complies with ISO 13857.[82] Georgia and Eleventh Circuit law make clear that industry standards are relevant to a manufacturer's standard of care and whether a product was defectively designed and admissible.[83]

In *Moncrieffe v. Clark Equip. Co.*, the district court determined that Dr. Warren's defective design and causation opinions were reliable and helpful, that ISO standards

---

81  Warren Supplemental Expert Report [Doc. 49-4, pp. 6-7; 42-29].

82  Schwamm Depo. [Doc. 49-7, p. 129]; Defendant's Response to Plaintiff's First Set of Interrogatories and Request for Production of Documents [Doc. 49-10, ¶ 6]; Defendant's Supplemental Response to Plaintiff's First Set of Interrogatories [Doc. 49-11, ¶¶ 7, 10]; and Thies Depo. [Doc. 49-12, pp. 8, 85].

83  *See Carroll v. Carnival Corp.*, 955 F.3d 1260 (11th Cir. 2020) (recognizing that plaintiff's expert's testimony that "the walkway was unsafe and fell below industry standards" was "relevant in determining whether Carnival's conduct fell below the standard of care); *Jones v. Miles Laboratories, Inc.*, 887 F.2d 1576 (11th Cir. 1989) (recognizing "[e]vidence of standard industry practice is often useful in determining the appropriate degree of care in an industry's operations"); *Johnson v. William C. Ellis & Sons Iron Works, Inc.*, 609 F.2d 820, 822 (5th Cir. 1979) ("[S]afety codes and standards are admissible when they are prepared by organizations formed for the chief purpose of promoting safety because are inherently trustworthy and because of the expense and difficulty involved in assembling at trial those who have complied with such codes."); *Jackson v. International Harvester Co.*, 380 S.E.2d 306 (Ga. Ct. App. 1989) (recognizing "evidence of compliance with the custom and practice of a particular industry" is relevant to determining the defendant's negligence).

were relevant and admissible, and that he could testify regarding the machine's violation

of ISO standards, in part because of the process by which ISO standards are promulgated:

[T]he two standards at issue have been promulgated by the International Organization
for Standardization ("ISO"), which is comprised of a worldwide federation of national
standards bodies. The standards are prepared through ISO technical committees, along
with governmental and non-governmental international organizations. Drafts of the
standards adopted by the technical committees are then circulated to others for approval,
and publications as an International Standard requires approval by at least 75% of the
voting member bodies of ISO.[84]

Like the court in *Moncrieffe*, this Court finds the ISO standards are "trustworthy

and relevant for the jury to discern the standard of due care and to decide whether [the

Machine] was defectively designed. The jury will not be instructed that a violation of the

standards is a *per se* breach; rather the standards will be one of the factors that the jury

may consider."[85]

**Opinion 1: "The clear plastic guard covering the hazardous inrunning nip where
[Plaintiff] was injured on the [Machine] was too close to the hazard given the height
of the slot opening below the guard."**

Defendant argues Dr. Warren's opinion that the guard was "too close" to the

hazard is just his subjective belief based upon unsupported assumptions and a flawed

methodology. Defendant contends Dr. Warren simply looked at ISO Table 4, compared

---

84  2008 WL 11333222 *16 (S.D. Fla. July 22, 2008).
85  *Id.*

it to the measurements he took of the Machine, and saw that the guard was closer to the hazard than the table specified. He then converted "closer" to "too close," which he then equated to "unreasonably dangerous" without establishing his qualification to render such an opinion, without basing the opinion on adequate facts or data, without demonstrating that the method used to reach the opinion was reliable, and without adequately accounting for obvious alternative explanations for the differences in distance between Table 4 and the Machine. The Court disagrees.

Dr. Warren is clearly qualified to offer Opinion 1. That he does not have specific experience in the design or operation of this Machine or other bag making machines does not render him unqualified to offer Opinion 1. The Eleventh Circuit has rejected "a bright line rule that an expert witness is qualified to testify regarding the cause of an injury only if he personally has used the allegedly defective product" and has held that "[r]equiring plaintiffs in product liability actions to hire expert witnesses who are also clients, customers, or regular users of the defendant's product would set a burden that is much 'too high.'"[86] As set forth above, Dr. Warren is a qualified expert in the fields of general

---

[86] *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 854 (11th Cir. 2021); *see also Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374 (M.D. Ga. 2014) (Royal, J.) (rejecting "Defendant's arguments that [mechanical engineer]is unqualified to offer his opinions because he has no experience with ladder stands specifically" and finding that the engineer's "lack of specific expertise with ladder stands goes to the weight of his testimony, not its admissibility").

mechanical engineering and machine design and safety, and Defendant may address any perceived shortcomings on cross-examination.

Defendant's objections to Dr. Warren's methodology go to the weight, not the admissibility, of Opinion 1. Dr. Warren inspected the Machine, took measurements, and calculated the distance from the guard to the hazard. He then tested the opening with the GUARDCHEK device and used his education, training, experience, evidence in the case, and industry standards to determine the guard's compliance with ISO 13857. Defendant's disagreement with Dr. Warren's conclusion—that the Machine's guard violated ISO 13857—goes to the weight, not the admissibility, of the opinion.

Likewise, Defendant's disagreement with Dr. Warren's use of the GUARDCHEK device to test the guard goes to the weight, not the admissibility, of the opinion. The GUARDCHEK device "is patterned after the dimensions found in Table O-10 of 29 CFR 1910.27, a safety code commonly used to determine maximum allowable guard openings based on the distance to a hazard."[87] The fact Dr. Warren tested the Machine with the GUARDCHEK device rather than Plaintiff's hand and other objections can be explored

---

87  Warren Expert Report [Doc. 49-3, pp. 12-15]; Warren Supplemental Expert Report [Doc. 49-4, p. 18]

on cross-examination. "Normally, failure to include variables will affect the analysis' probativeness, not its admissibility."[88]

Finally, Dr. Warren's opinion will assist the jury. Despite Defendant's arguments to the contrary, the Court agrees with Plaintiff that the average lay person does not measure and calculate safety distances on machines, have knowledge of inrunning nip points and hazards, understand machine guarding standards, including ISO 13857, or have the mechanical engineering education, training, and experience Dr. Warren possesses. Dr. Warren's testimony that the Machine's guard was too close to the hazard given the height of the opening beneath the guard directly relates to the factual issue of whether the design of the Machine's guard was defective and unreasonably dangerous. And whether Dr. Warren applied certain facts when performing his analyses goes to weight, not admissibility. Thus, Defendant's request to exclude Opinion 1 is **DENIED**.

**Opinion 2:** "Reducing the height of the slot to 20 mm would have complied with the requirements of ISO 13857:2008(E) section 4.2.1 and Table 4 and would have prevented [Plaintiff's] injury[.]"

Defendant argues Dr. Warren's Opinion 2 should be excluded because (1) it is unhelpful to the jury as it is within the understanding of the average lay person; (2) he is

---

[88] *Quiet Tech. DC-8, Inc. v. Hurel Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) (internal quotation marks and citation omitted).

not qualified to render the legal opinion that certain measurements would be in compliance with any statute or guideline; and (3) he formulated the opinion using flawed methodology because he failed to determine if the reduced gap size would have prevented a hand and arm of Plaintiff's size from reaching the draw rolls. The Court is unconvinced.

ISO 13857 is a technical industry standard that requires an understanding of safety distances, hazards, and different types of openings (slot, square, and round), and the Court is unconvinced such comprehension is within the understanding of the average lay person. Moreover, Dr. Warren is qualified to render the opinion. Again, the fact Dr. Warren does not have experience in the design or operation of the Machine or other bag making machines goes to the weight, not the admissibility, of his opinion, and Defendant may certainly address these concerns on cross examination. Likewise, the issues Defendant raises with Dr. Warren's methodology go to weight, not admissibility, and may be explored on cross-examination. Thus, Defendant's request to exclude Opinion 2 is **DENIED**.

**Opinion 3**: **"Both my measurements and the measurements taken by Mr. Winkler demonstrate that the Machine violates: a. 29 CRF 1910.212 section (a)(3)(ii); b. ASME B15.1-2000 section 3.2.1 and Figure E12; c. 29 CFR 1910.217 table O-10; and d. ISO 13857:2008(E) table 4."**

Defendant argues Opinion 3 should be excluded because the standards and the OSHA regulations identified are inapplicable and irrelevant, and he is not qualified to offer the opinion. But evidence of a manufacturer's compliance with ISO standards, ANSI standards, and OSHA regulations is relevant, albeit not determinative, in deciding whether the manufacturer met the standard of care and whether a product was defectively designed.[89] Moreover, Defendant's own expert, Mr. Richard Parry, states in his expert report that "[r]egarding what is or is not safe in the United States, American National Standards (ANSI) and OSHA (Occupational Safety and Health Administration) safety standards are determinative[.]"[90] Finally, Dr. Warren is qualified to offer an opinion as to whether the Machine complies with industry standards, and his opinion will assist the trier of fact. Thus, Defendant's request to exclude Opinion 3 is **DENIED**.

**Opinion 4: "The subject bag machine is improperly guarded."**

Defendant argues that in stating that the guarding was "improper," Dr. Warren is opining that the Machine failed to meet the applicable standard of care, which implicates

---

89 *Carroll v. Carnival Corp.*, 955 F.3d 1260 (11th Cir. 2020); *Moncrieffe v. Clark Equip. Co.*, 2008 WL 11333222 at *15-16 (S.D. Fla. July 23, 2008) (finding ISO standards relevant and admissible); *Long v. Amada Mfg. America, Inc.*, 2004 WL 5492705 at *14 (N.D. Ga. March 31, 2004) (allowing experts to "discuss the OSHA regulations and ANSI standards as illustrative of negligence and design defect").
90 Parry Expert Report, p. 1 [Doc. 49-5, p. 3].

a legal conclusion masquerading as an expert opinion; a conclusion that is based on unreliable methodology and is unhelpful to the jury. The Court disagrees.

Although Dr. Warren's opinion relates to ultimate issues in the case—whether the design of the guard was defective and a cause of Plaintiff's injuries—it is not an impermissible opinion as to the ultimate legal issue in the case. The jury must decide whether the Machine was improperly guarded and a cause of Plaintiff's injuries. Dr. Warren's opinion that the Machine was improperly guarded is based on his education, training, experience, inspection and testing of the Machine, knowledge of industry standards, and his review of the evidence in this case. It is reliable, and it will help the jury determine ultimate issues of fact. Whether the Machine was improperly guarded may be a piece towards establishing Defendant's liability, it is not the ultimate legal issue. Thus, Defendant's request to exclude Opinion 4 is **DENIED.**

**<u>Opinion 5</u>: "The improperly guarded machine is defective and unreasonably dangerous."**

Defendant argues Dr. Warren's Opinion 5 should also be excluded as an improper legal conclusion. But, like Opinion 4, Opinion 5 is not an improper legal conclusion. Indeed, Defendant's own expert, Mr. Richard Parry, opines that the Machine "was reasonably safe for its intended use," the Machine "was safe and fit for its intended use,"

and "posed no 'unreasonable danger to users.'"[91]  While Dr. Warren's opinion that the improperly guarded machine is defective and unreasonably dangerous may lead to a certain legal outcome, it is not a legal conclusion. Instead, it is a factual conclusion based on his education, training, experience, inspection and testing of the Machine, knowledge of industry standards, and his review of the evidence in this case, that will assist the jury in determining the issues. Thus, Defendant's request to exclude Opinion 5 is **DENIED**.

**Opinion 6**: **"The defective and unreasonably dangerous condition of the subject bag machine is a cause of Mr. Bhoodai's injury."**

Despite Defendant's arguments to the contrary, Dr. Warren may testify as to the cause of Plaintiff's injury. "While this opinion may lead to a certain legal outcome, it is not a legal conclusion but a factual one."[92]  Dr. Warren's opinion does not prove Plaintiff's hand was pulled under the guard and came into contact with the inrunning nip point— that is a determination the jury must make. Rather, Dr. Warren's opinion is that Plaintiff's hand was <u>able</u> to be pulled under the guard—an opinion he is qualified to render as a

---

91 Parry Expert Report [Doc. 49-5, pp. 4, 7-8].

92  *Kennedy v. Electric Ins. Co.*, 2019 WL 2090776 at 4 (S.D. Ga. May 13, 2019) (rejecting the defendant's argument that an expert's "opinions on the cause of the damage at issue, i.e., that a tornado caused the damage" was a legal conclusion); *see also Bryant v. BGHA, Inc.*, 9 F. Supp. 3d 1374 (M.D. Ga. 2014) (Royal, J.) (finding opinions that "the ladder rail protrusions, the lack of adequate handholds, and the failure to provide adequate warnings are hazardous conditions with no justifiable benefits" and that these defects caused the plaintiff's injuries "will be helpful to the jury with its determination of the defective design, failure to warn, and causation issues raised"); *Kilgore v. Reckitt Benckiser, Inc.*, 917 F. Supp. 2d 1288 (N.D. Ga. 2013) (admitting expert's opinion as to the cause of the fire in the plaintiffs' home).

mechanical engineering and machine design and safety expert, and one that is reliably based on the tests he performed, his education, experience, and evidence in the record.

"Whatever shortcoming Defendant perceives in Dr. Warren's academic or professional background can be properly addressed in cross-examination."[93] And any issues with the methodology Dr. Warren used to formulate his opinion goes to its weight, not its admissibility. The alleged flaws in Dr. Warren's analysis "are of a character that impugn the accuracy of his results, not the general scientific validity of his methods."[94] On cross examination, opposing counsel will be given the opportunity to "ferret out the opinion's weaknesses and ensure the jury properly evaluates the testimony's weight and credibility."[95] Thus, Defendant's request to exclude Opinion 6 is **DENIED**.

B. **PLAINTIFF'S MOTION TO EXCLUDE OPINIONS BY DEFENDANT'S EXPERT RICHARD PARRY**

Defendant engaged Richard Parry as an expert of matter of mechanical engineering and machine design and safety. Plaintiff seeks to exclude certain opinions under Rule 702, *Daubert*, and its progeny.

---

93 *Moncrieffe v. Clark Equip. Co.*, 2008 WL 11333222 at *7 (S.D. Fla. July 23, 2008).
94 *Quiet Tech.*, 326 F.3d at 1345.
95 *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988).

1. **Mr. Parry's Qualifications**

Mr. Parry received his Bachelor of Mechanical Engineering from General Motors Institute in 1960 and attended the University of Michigan Graduate School of Engineering and Graduate School of Business, earning "probably half the hours for a graduate degree" in both.[96] Since 1995, Mr. Parry has been a litigation consultant at Parry Parry & Glen, where he provides expert analysis and testimony in product liability and OSHA litigation involving the control, use and safeguarding of machine tools, presses, cranes, conveyors and similar industrial equipment.[97] He has also been involved in the development of ASNI/ASME safety codes and standards and provided interpretation of OSHA regulations, building codes and similar types of regional safety rules.[98]

Before becoming a consultant at Parry Parry & Glen, Mr. Parry was a staff engineer at General Motors Corporation ("GM") for 22 years and was an industry or GM representative on six national safety standards committees (ANSI/ASME): lifting equipment and cranes, B30; elevators, A17; conveyors, B20; presses & machine tools, B11; and power transmission, B15. He was a member of the ASME Supervisory Board on Safety Codes and Standards, and on the B20 Committee on Safety Standard for

---

96  Parry Depo. [Doc. 49-2, p. 18].
97  Parry Expert Report [Doc. 49-5, pp. 15-16].
98  *Id.*

Conveyors and Related Equipment. Mr. Parry provided maintenance management consulting throughout GM and communicated GM's and the automobile industry's position when regulations were formulated. Mr. Parry also provided engineering services at Chevrolet V8 Engine, GMC; Boeing Airplane Company; Anderson Tank & Mfg. Co.; and AC Spark Plug Division, GMC.[99] Mr. Parry has an extensive background in the control, use, and safeguarding of machine tools, presses, cranes, and conveyors.[100]

2. **Mr. Parry's Opinions**

Mr. Parry opines that the design of the Machine was safe for its intended use, offered no recognized hazard when operated in accordance with the manufacturer's instructions utilizing the safeguards provided, and was compliant with applicable ANSI and OSHA safety standards. In formulating his opinions, Mr. Parry inspected the Machine on July 9, 2019, and reviewed the following: the parties' discovery responses; depositions of Defendant's employees; Plaintiff's OSHA Statement; the Machine's Operating Manual; Dr. Warren's measurements, photographs, and expert report; and industry standards and regulations.[101]

---

99  *Id.*
100  *Id.*
101  *Id.* at pp. 7-8.

Mr. Parry concludes that the Machine was safe and fit for its intended use, and the cause of Plaintiff's accident and injuries was Plaintiff and Flexo's failure to utilize the safeguards and training specifically designed to keep an operator's hands away from the moving bag material.[102]  Five of Mr. Parry's opinions are in dispute.

**Opinion 1: The guard on the Machine complied with 29 CFR 1910.212, 29 CFR 1910.219, and Section 3.2.1 of ASME B15.1-2 because the guard prevents an individual from inadvertently or accidentally accessing the hazardous parts of the machine.**

Plaintiff argues Mr. Parry should be precluded from offering Opinion 1 because the referenced standards and regulations do not contain the words "inadvertent" or "accidental;" thus, the opinion misstates the standards and is therefore unreliable, unhelpful, and likely to confuse or mislead the jury. The Court disagrees.

Mr. Parry explained that based on his training and direct experience working with the standards committee, the <u>purpose</u> of the standards is to prevent inadvertent or accidental contact with any mechanical power transmission apparatus, such as the draw rolls.[103]  Plaintiff fails to explain how Mr. Parry misstates the standards. Plaintiff's objections go to the weight of Mr. Parry's opinion, not its admissibility, and Plaintiff may

---

102  Parry Expert Report [Doc. 49-5, pp. 10-14].
103  *Id.* at pp. 60, 63-64.

explore his concerns on cross examination. Thus, Plaintiff's request to exclude Opinion 1 is **DENIED**.

**Opinion 2: An individual's hand cannot reach underneath guard and access the draw rolls; an individual cannot access the draw rolls inadvertently or accidentally.**

Plaintiff objects to Mr. Parry testifying that an individual's hand cannot reach under the Machine's guard and reach the draw rolls or that an individual cannot inadvertently or accidentally reach the draw rolls. Plaintiff claims such testimony would be speculation and unsupported by sufficient facts or data. But the Court finds Plaintiff's objections go to the weight, not the admissibility of such testimony. Mr. Parry's opinion is based on his concurrence with Dr. Warren's measurements; his inspection of the Machine; and his education and experience with OSHA incidents and machine-related injuries. Plaintiff may explore the fact that Mr. Parry did not put his hand under the Machine or inspect the Machine in its original condition on cross examination. "Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[104]  Thus, Plaintiff's request to exclude Opinion 2 is **DENIED.**

---

104  *Daubert*, 509 U.S. at 596.

**Opinion 3:** **International and European safety standards are inapplicable to the Machine.**

Mr. Parry testified that the international standards published by ISO "don't apply to U.S. machines," that "European standards should not even be allowed into the courtroom because they are not U.S. standards, and there's no tie between European standards and the U.S. standards aside from the fact that if you meet the European standards, you will have met the OSHA standard," and that DIN EN 1010-1, ISO 13875, ISO 12100, and Directive 2006/42/EC are "European standards" that don't apply to the Machine.

Mr. Parry is not qualified to offer this opinion. Whether international safety standards are applicable to determine whether the Machine was defectively designed is a legal issue the Court decides. And, as explained above, the Court finds that the international industry standards are relevant and admissible for the jury's consideration in determining whether Defendant met the standard of care and whether the Machine was defectively designed. Thus, Mr. Parry is precluded from telling the jury that the international industry standards are inapplicable or irrelevant. Plaintiff's request to exclude Opinion 3 is **GRANTED**.

**Opinion 4: The guard was raised when Plaintiff's injury occurred.**

Plaintiff contends Mr. Parry should be precluded from offering any opinion or testimony that the guard on the Machine was raised at the time of Plaintiff's injury because it is not based on sufficient facts or data and will not assist the trier of fact. The Court agrees.

Mr. Parry's opinion that the guard was raised at the time of Plaintiff's injury is not based on any "scientific, technical, or other specialized knowledge [that] will help the trier fact understand the evidence or [ ] determine a fact in issue."[105]  Mr. Parry bases his opinion on (1) his conclusion that a person's hand cannot reach back through the gap under the guard to the draw rolls when the guard is closed without lifting the guard, which would trigger the Machine's automatic shut-off mechanism; (2) the testimony of Sergej Schwamm, Defendant's service technician for the 5QT machines, and Juergen Schlautmann, who installs the 5QT machines for Defendant, that it is not possible for a finger or hand to be caught or pulled under the protective hood to the draw roller; (2) defense counsel's representation that other employees of Flexo Converters had seen Plaintiff working with the guard raised on prior occasions; (3) pictures taken by Dr.

---

[105]  Fed. R. Evid. 702(a).

Warren; and (4) public OSHA records showing employees at Flexo Converters had bypassed safety interlocks on other machines, on other occasions.[106]

An expert's opinion must be based on sufficient facts or data and "have a reliable basis in the knowledge and experience of his discipline."[107] Mr. Parry's opinion fails to satisfy these criteria. There is nothing verifiable or quantifiable offered to support an expert opinion that the guard was raised at the time of Plaintiff's injury. Instead, his opinion is based almost entirely on anecdotal sources, including hearsay from fact witnesses about Plaintiff's acts on other occasions, other employees' conduct with other machines on other occasions, and testimony from Defendant's employees. Mr. Parry fails to explain how the sources of information on which he relies are of the type experts in his field would "reasonably rely on" in forming his opinion about the cause of Plaintiff's injuries from the Machine.[108] He fails to "explain <u>how</u> his experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[109]

---

[106] Parry Depo., pp. 49-51, 54 [Doc. 49-2]; Parry Expert Report, pp. 7-9 [Doc. 49-5].
[107] Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592.
[108] Fed. R. Evid. 703.
[109] *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)); *see also Plott v. NCL Am., LLC*, 786 F. App'x 199, 204 (11th Cir. 2019) (affirming district court's exclusion of proffered expert testimony where the expert "did not demonstrate how his experience as an architect led to his conclusions and opinions [on what caused and could have prevented a slip and fall accident], why that experience was sufficient, or how his experience applied to

Mr. Parry's opinion also will not help the jury. Jurors do not need expert testimony to determine whether the guard was raised at the time of the accident. Indeed, Defendant states in its response brief that Mr. Parry's opinion is based on common sense. Defense counsel may point to evidence in the record supporting its contention that Plaintiff operated the Machine with the guard raised and argue it to the jury. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[110] Thus, Mr. Parry is precluded from opining that Plaintiff operated the Machine on the day of the incident with the guard raised. Plaintiff's request to exclude Opinion 4 is **GRANTED**.

**<u>Opinion 5</u>: "[T]he accident and the injuries that were caused was the failure of Plaintiff or Flexo to utilize the safeguards and the training that were provided when restarting after a paper break" and "because they failed to follow the instructions and were trying to take a shortcut."**

Plaintiff also objects to Mr. Parry's opinion that Plaintiff's injuries were caused because Plaintiff or Flexo failed to utilize the safeguards and training and failed to follow instructions because it is not supported by sufficient facts or data and will not assist the trier of fact. The Court agrees.

---

[plaintiff's] case").
110  *Frazier*, 387 F.3d at 1262-63.

Like Mr. Parry's opinion that Plaintiff operated the Machine with the guard raised, this opinion does not have a reliable basis in Mr. Parry's knowledge and experience as a mechanical engineer and will not assist the trier of fact. The opinion relies on nothing more than what the factfinder could comprehend through non-expert witnesses and third-party sources. Defendant's attorneys may argue that Plaintiff's injuries were caused by his failure to use certain safeguards and training, and it is the type of common-sense determination that the jury is qualified to make without the aid of an expert. Thus, Plaintiff's request to exclude Opinion 5 is **GRANTED**.

## II.   PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE EVIDENCE PLAINTIFF OPERATED THE MACHINE WITH THE GUARD RAISED ON PRIOR OCCASIONS

A motion in limine is a motion to exclude or admit "evidence before the evidence is actually offered."[111] While motions in limine provide courts with the opportunity to rule on thorny evidentiary issues outside the time pressure of trial, courts should hesitate before "rul[ing] on subtle evidentiary questions outside a factual context."[112] "In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds."[113] "The movant has

---

111 *Luce v. United States*, 496 U.S. 38, 40 n.2 (1984).
112 *Id.* at 41.
113 *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010).

the burden of demonstrating that the evidence is inadmissible on any relevant ground."[114] "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so questions of foundation, relevancy, and potential prejudice may be resolved in proper context."[115] "Likewise, [i]n light of the preliminary or preemptive nature of motions *in limine*, any party may seek reconsideration at trial in light of the evidence actually presented and shall make contemporaneous objections when evidence is elicited."[116]

Plaintiff seeks to exclude evidence and argument that Plaintiff operated the Machine with the guard raised on prior occasions before his injury on April 3, 2018. Dennis Edmondson, an employee of Flexo Converters at the time of Plaintiff's injury, stated in his deposition that he had seen Plaintiff working on the Machine with the safety cutoff switch bypassed and the protective guard raised on a few prior occasions. Plaintiff contends Mr. Edmondson's testimony is inadmissible evidence of habit under Fed. R. Evid. 406 and inadmissible character evidence under Fed. R. Evid. 404. Defendant agrees such evidence is not admissible under Rules 406 and 404, and instead argues it is

---

114 *Id.* (citation omitted).
115 *Palmetto 241 LLC v. Scottsdale Ins. Co.*, 2020 WL 2736646 at *1 (S.D. Fla. May 26, 2020) (internal quotation marks and citation omitted).
116 *Id.* (internal quotation marks and citation omitted).

admissible to rebut Plaintiff's direct testimony that he had never operated the Machine with the guard in the raised position, to show that Plaintiff had the knowledge to operate the machine in such a manner, and to impeach Plaintiff's testimony and credibility.

Generally, "[a]ny evidence tending to make the existence of any fact of consequence more probable or less probable, is relevant and admissible, except that relevant evidence 'may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury[.]'"[117] Edmonson's testimony that Plaintiff had operated the Machine on prior occasions with the guard raised is not admissible to show that Plaintiff operated the Machine with the guard raised on the date of his injury. But Edmonson's testimony is relevant to rebut and impeach Plaintiff's testimony that he has never operated the Machine with the guard raised and his testimony that the Machine cannot operate with the guard raised. Moreover, the evidence is material to Defendant's comparative negligence, assumption of the risk, and avoidance defenses. The Court is unconvinced at this time that the probative value of the evidence is outweighed by any danger of unfair prejudice. Thus, the Court **DENIES**

---

117 *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 WL 2295269 (S.D. Fla. June 7, 2011) (citing Fed. R. Evid. 401, 402 & 403).

Plaintiff's motion. But "[i]n limine rulings to admit or exclude evidence are always preliminary and conditioned on what the evidence shows at trial."[118]

### III. **DEFENDANT'S MOTION TO EXCLUDE SUBSEQUENT REMEDIAL MEASURES**

Defendant seeks to exclude evidence demonstrating that after Plaintiff's injury, Flexo Converters added a piece of plexiglass to the existing plexiglass guard on the Machine to extend the shield downward to reduce the size of the gap under the guard and improve safety. Defendant contends this evidence is irrelevant, unduly prejudicial, and inadmissible as a subsequent remedial measure under Fed. R. Evid. 407.

"Rule 407 does not apply to a remedial measure that was taken without the voluntary participation of the defendant" and does not bar evidence of actions taken by a non-defendant.[119]  Flexo Converters, not Defendant, added the piece of plexiglass to the Machine's guard. Thus, the Court will not exclude the evidence as a subsequent remedial measure.

But the Court needs more information to determine whether Flexo Converter's extension of the guard is relevant of a feasible alternative design or to the risk-utility

---

118 *Rosenfeld v. Oceania Cruises, Inc.*, 682 F.3d 1320, 1325 (11th Cir. 2012) (citation omitted).
119 *Millenium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1302-03 (11th Cir. 2007) (finding "District Court did not abuse its discretion in admitting evidence of repairs to the warehouse made by a non-defendant").

factors and not unfairly prejudicial to Defendant. Thus, the Court will address this Motion more fully with the parties at the pretrial conference. Defendant's Motion to Exclude Subsequent Remedial Measure is **HELD IN ABEYANCE** until the pretrial conference**.**

IV. **PLAINTIFF'S MOTION FOR SANCTIONS**

Plaintiff argues Defendant should be barred under Rule 37 from using the Affidavit of Christian Burkhardt, Head of Trade Finance and Defendant's liaison to legal counsel, attached as Exhibit C to Defendant's Motion for Summary Judgment, as evidence in support of its summary judgment motion, and Defendant should be prohibited from offering the testimony at trial. Burkhardt states in his affidavit that Defendant was not aware of any machine operator other than Plaintiff ever having been injured using a Triumph 5QT Block Bottom Bag Machine and that Defendant's files do not contain any reports of injuries, claims, or incidents involving operator safety arising out of the use of the Machines.[120]  Plaintiff claims Defendant did not disclose or identify Mr. Burkhardt until after the close of discovery and therefore should not be able to use his testimony.

---

120  Burkhardt Affidavit [Doc. 51-6].

Fed. R. Civ. P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." "Substantially justified means that reasonable people could differ as to the appropriateness of the contested action."[121] "Prejudice generally occurs when the late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question."[122] "Rule 37 sanctions are intended to prevent unfair prejudice to the litigants and ensure the integrity of the discovery process."[123] A district court has substantial discretion in deciding whether to impose sanctions under Rule 37.[124]

Plaintiff has suffered no unfair prejudice. Although Plaintiff claims to have been "sandbagged" and prejudiced, numerous witnesses deposed by Plaintiff's counsel have testified that they have no knowledge of any injuries to Machine operators or of any operator's hand ever passing through the gap under the guard.[125] Moreover, in response

---

121 *Knight through Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 812 (11th Cir. 2017) (quoting *Maddow v. Procter & Gamble Co., Inc.* 107 F.3d 846, 853 (11th Cir. 1997)).

122 *Paul v. Aramark Healthcare Support Srvcs., LLC*, 2016 WL 788045 at *4 (N.D. Ga. June 2, 2016) (citation omitted).

123 *Gratton v. Great Am. Commc'n*, 178 F.3d 1373, 1374 (11th Cir. 1999) (*per curiam*).

124 *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 2016).

125 *See* Depositions of Richard Parry at 41, 42, 45, 49-50, 55 [Doc. 49-2]; Anthony Williams at 9-10 [Doc. 50-4]; Sergej Schwamm at 45, 47, 48, 55 [Doc. 49-7]; Juergen Schlautmann at 36, 53, 59 [Doc. 49-8];

to Plaintiff's Request for Production number 8 which sought the identification and production of "[a]ny documents related to any complaints, incident reports, claims, or lawsuits regarding the Triumph 5QT, 7582G, S.O.S. Block Bottom Bag Machine," Defendant responded: "**None.**"[126]

In preparation for the defense counsel's motion for summary judgment, Burkhardt was asked to review Defendant's sales and production records and all records of Machine-related injuries, incidents, or complaints, and provide an affidavit reflecting Defendant's information. Burkhardt is not an engineer, nor does he have any technical expertise or knowledge. His affidavit simply reflects the information contained in Defendant's records that corroborates Defendant's discovery responses and the testimony of witnesses deposed by Plaintiff's counsel. Thus, the substantive information contained in Burkhardt's affidavit is not new evidence nor could it be construed as a surprise to Plaintiff's counsel. It has been Defendant's position from the beginning of this case that the Machine is not unreasonably dangerous or defective as evidenced by the fact that no machine operator other than Plaintiff had ever been injured using the

---

Christopher DeGrote at 30, 32, 36-37 [Doc. 50-6]; Dennis Edmondson at 8-9, 25-26 [Doc. 50-3];and Anthony Studebaker at 23-24, 30-31 [Doc. 50-5].
126  Defendant's Response to Plaintiff's Request for Production of Documents [Doc. 56-2, p. 15].

Machine.[127]  The Court finds Defendant's failure to identify Burkhardt to be harmless and

**DENIES** Plaintiff's Motion for Sanctions.

V.   **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant seeks summary judgment arguing Plaintiff's claims fail because (1) no

genuine issue of material fact exists to show that any defect in the Machine proximately

caused Plaintiff's injuries; (2) Plaintiff's claims are barred by the doctrine of avoidable

consequences; and (3) Plaintiff's claims are barred by Plaintiff's assumption of the risk.

LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must

be granted "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[128]   A genuine issue of

material fact only exists when "there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party."[129]   Thus, summary judgment must be

granted if there is insufficient evidence for a reasonable jury to return a verdict for the

nonmoving party or, in other words, if reasonable minds could not differ as to the

---

127  *See* Answer, First, Second, Tenth, and Twelfth Defenses [Doc. 27].
128  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
129  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

verdict.[130]  In ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[131]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[132]   If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[133] This evidence must consist of more than mere conclusory allegations or legal conclusions.[134]

## ANALYSIS

### A. __Proximate Cause__

Defendant first argues Plaintiff's claims fail for lack of evidence of proximate causation. "The sine qua non of a products liability claim, regardless of whether the

---

[130] *See id.* at 249-52.

[131] *Welch v. Celotex Corp.,* 951 F.2d 1235, 1237 (11th Cir. 1992).

[132] *Celotex Corp.,* 477 U.S. at 323 (internal quotation marks omitted).

[133] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.,* 477 U.S. at 324-26.

[134] *See Avirgan v. Hull,* 932 F.2d 1572, 1577 (11th Cir. 1991).

plaintiff proceed under a theory of strict liability or negligence, is a defect in the product."[135]  In Georgia, "[t]he manufacturer of any personal property sold as new property directly or through a dealer . . . shall be liable in tort . . . to any natural person who may use . . . or reasonably be affected by the property and who suffers injury to his person . . . because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained."[136]  Three kinds of product defects result in a product that is "not merchantable and reasonably suited to the use intended": design defects, manufacturing defects, and marketing/packaging defects.[137]

Plaintiff claims the Machine had both design and manufacturing defects. In addition to these strict liability claims, Plaintiff also claims the Machine was negligently designed and manufactured. "[O]nly semantics distinguishes the cause of action for negligence and a cause of action for negligence and [strict liability]."[138]

Proximate cause is a necessary element of Plaintiff's case under both strict liability and negligence. "Unless the manufacturer's defective product can be shown to be the

---

[135] *Boswell v. Overhead Door Corp.*, 292 Ga. App. 234, 235 (2008).
[136] O.C.G.A. § 51-1-11.
[137] *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 733 (1994).
[138] *Id.* at 735 n. 3 (citation omitted).

proximate cause of the injuries there can be no recovery." [139] "The requirement of proximate cause constitutes a limit on legal liability; it is a policy decision, that, for a variety of reasons, e.g., intervening act, the defendant's conduct and the plaintiff's injury are too remote for the law to countenance recovery. Although many legal scholars have attempted to lay down a single standard to determine proximate causation, no satisfactory universal formal has emerged. Instead, proximate cause is always to be determined on the facts of each case upon mixed considerations of logic, common sense, justice, policy and precedent." [140] "[W]hether proximate cause exists in a given case is a mixed question of law and fact. It requires both fact-finding in the 'what happened' sense, and an evaluation of whether the facts measure up to the legal standard set by precedent. Ordinarily both determinations are most appropriately made by a jury upon appropriate instructions from the judge." [141]

Defendant argues it could not have reasonably foreseen Plaintiff's injuries because no evidence exists showing any similar incident or injury ever occurring to anyone; thus, Defendant had no notice of the risk such an incident could occur. The Court is unconvinced. Plaintiff claims his injuries occurred because his hand was pulled through

---

139 *Talley v. City Tank Corp.*, 158 Ga. App. 130, 135 (1981).
140 *Atlanta Obstetrics & Gynecology Group, P.A. v. Coleman*, 260 Ga. 569 (1990).
141 *Id.*

the opening beneath the guard and into the allegedly hazardous inrunning nip points between the two draw rolls behind the guard. Plaintiff's expert, Dr. Warren, opines that the opening under the guard was too large and failed to comply with applicable safety standards and therefore a cause of Plaintiff's injuries. Defendant points to no legal precedent establishing that an injury is not foreseeable because the defendant has no record of any such injuries occurring. The jury may certainly consider such evidence in determining foreseeability. But the Court cannot find as a matter of law Defendant could not reasonably foresee that a guard that fails to comply with applicable safety standards and allows access to a hazard it was intended to guard against, would result in injury. Proximate cause in this case is not "plain and undisputed" and must be determined by the jury.[142]

## B. **Doctrine of Avoidable Consequences**

Defendant also contends Plaintiff's claims are barred by the doctrine of avoidable consequences. Under the doctrine of avoidable consequences, "if the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's

---

142 *Blondell v. Courtney Station 300 LLC*, 865 Ga. App. 1, 5 (2021) ("[I]t is axiomatic that questions regarding proximate cause 'undeniably a jury question' and may only be determined by the courts 'in plain and undisputed cases.'") (citations omitted).

negligence, the plaintiff is not entitled to recover."[143]  A "plaintiff must exercise ordinary care for his own safety, and must by the same degree of care avoid the effect of the defendants' negligence after it becomes apparent to him or in the exercise of ordinary care he should have learned of it. [The plaintiff] must make use of all his senses in a reasonable measure amounting to care in discovering and avoiding those things that might cause hurt to him."[144]

Under this doctrine, a "plaintiff's negligence in failing to avoid the consequences of the defendant's negligence is deemed the sole proximate cause of the injuries sustained and, therefore, is a complete bar to recovery, unless the defendant willfully and wantonly inflicted the injuries."[145]  As with other affirmative defenses, Defendant has the burden to prove "that the plaintiff by ordinary care could have avoided the consequences to himself or herself caused by defendant's negligence."[146]   The issue of whether the plaintiff "exercised due diligence for his own safety is ordinarily reserved for the jury" and may only be "summarily adjudicated where the plaintiff's knowledge of the risk is clear and palpable."[147]

---

143  *Weston v. Dun. Transp.*, 304 Ga. App. 84, 87 (2010) (quoting O.C.G.A. § 51-11-7).
144  *Lowery's Tavern v. Dudukovich*, 234 Ga. app. 687, 690 (1998).
145  *Weston*, 304 Ga. App. at 87.
146  *Id.* at 88 (citation omitted).
147  *Id.* (citation omitted).

Defendant argues Plaintiff could have avoided his injury by using the available two-hand jog mechanism to feed the paper into the Machine. But Defendant's argument must be considered by the jury. Unlike the plaintiffs in the cases cited by Defendant, Plaintiff claims he did not intentionally put himself at risk.[148]  Plaintiff testified that it was unnecessary for him to use the two-hand jog, and he did not know that the guard violated applicable safety standards, did not know that his hand could be pulled under the guard, did not reach under the guard, and thought that the guard would prevent access to the inrunning nip behind the guard. Thus, Plaintiff's knowledge of the risk is not "clear and palpable," and whether Plaintiff could have avoided the injury must be determined by the jury.

C. **Assumption of the Risk**

---

[148] *See Weston v. Dun Transp.*, 304 Ga. App. 84 (2010) (doctrine of avoidable consequences barred plaintiff's action because decedent had navigated the intersection multiple times, knew the loader blocked her view of southbound traffic, intentionally moved her car's front end to the southbound lane to get a better view, and was struck by a tractor-tailer when she "suddenly accelerated [across the southbound lane] in hopes of getting out of its way."); *Lowery's Tavern, Inc. v. Dudukovich*, 234 Ga. App. 687 (1998) (doctrine of avoidable consequences barred plaintiff's claims after he fell down an elevator shaft because "the risks associated with [the plaintiff] departing from a safe and direct route to his destination, proceeding through a dark, debris-filled alley, opening doors that gave access to the elevator shaft, and stepping into a dark hold in the side of a building were so patent, and [plaintiff's] conduct was so unreasonable[.]"); *City of Winder v. Girone*, 265 Ga. 723 (1995) (doctrine of avoidable consequences barred plaintiff's claim after she slipped and fell on sewage on her patio because she knew sewage had flooded her basement, and she had opened the doors and allowed sewage to flow onto her patio).

Finally, Defendant argues Plaintiff assumed the risk of injury because Plaintiff had been warned of danger posed by the draw rolls, he knew it was dangerous to put his hands on the paper as it was being fed into the Machine, and he knew how to use the two-hand jog mechanism.

"The affirmative defense of assumption of the risk bars recovery when it is established that a plaintiff, 'without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not.'"[149]  To establish an assumption of the risk defense in Georgia, a defendant must establish "that the plaintiff '(1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.'"[150]  Knowledge is the "watchword of assumption of the risk, and means both actual and subjective knowledge on the plaintiff's part." [151]  Assumption of the risk "is ordinarily a jury question," and it may only be summarily adjudicated "in plain, palpable, and indisputable cases."[152]

---

149  *Thompkins v. Gonzalez-Nunez*, 355 Ga. App. 144, 145-45 (2020).
150  *Id.* (citing *Watson v. Reg'l First Care, Inc.*, 335 Ga. App. 740, 741 (2016)).
151  *Watson,* 335 Ga. App. at 741.
152  *Thompkins*, 355 Ga. App. at 146.

Defendant has not established as a matter of law that Plaintiff assumed the risk of his injury. Again, Plaintiff testified that it was not necessary for him to use the two-hand jog, he was not aware his hand could be pulled under the guard, and he believed the purpose of the guard was to prevent his hand accessing the draw rolls behind the guard. Although Plaintiff knew being pulled into the draw rolls could injure him, there is evidence that he did not know of the specific risk that his hand could be inadvertently pulled through the gap underneath the guard. This is not a "plain, palpable, and indisputable" case, and the jury must determine the validity of this defense.

## CONCLUSION

For the reasons explained above, Defendant's Motion to Exclude Opinion and Testimony from Plaintiff's Expert Jeffrey Warren [Doc. 51] is **DENIED**; Plaintiff's Motion to Exclude Opinion and Testimony of Defendant's Expert Richard Parry [Doc. 49] is **GRANTED in part and DENIED in part**; Plaintiff's Motion in Limine to Exclude Evidence that Plaintiff Operated the Machine with the Guard Raised [Doc. 50] is **DENIED**; Defendant's Motion in Limine regarding Subsequent Remedial Measures [Doc. 52] is **HELD IN ABEYANCE** until the pretrial conference; Plaintiff's Motion for Sanctions [Doc. 55] is **DENIED**; and Defendant's Motion for Summary Judgment [Doc. 51] is **DENIED**.

**SO ORDERED**, this 29th day of September, 2022.

S/C. Ashley Royal

C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT